## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KENN A. DEFREITAS,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MONTGOMERY COUNTY** | : | **No. 08-5330** |
| **CORRECTIONAL FACILITY, et al.,** | : | |
| **Defendants.** | : | |

### M E M O R A N D U M

**Stengel, J.**                                                          **July 18, 2012**

  This is a prisoner civil rights case.  Kenn DeFreitas is an above-the-knee amputee.

When he began his incarceration on July 19, 2008, he used crutches to walk and he

alleges that the guards mocked him, placed him in housing that was unsafe for his

condition, disallowed him from going outside, and generally refused to accommodate

him.  Mr. DeFreitas sued the Montgomery County Correctional Facility ("MCCF"),

Montgomery County, and Correctional Medical Care, Inc., ("CMC") under the ADA and

§ 1983.  The parties have filed cross motions for summary judgment.  For the reasons

stated below, I will deny the Plaintiff's partial motion for summary judgment and grant

the Defendants' partial motions for summary judgment.

### I.  Background

  Plaintiff began his incarceration at MCCF on July 18, 2008.[1]  Doc. No. 58-1 at ¶

1,[2]  Doc. No. 61 at ¶ 2.[3]  Mr. Defreitas is an above-the-knee amputee who uses a

---

[1] Plaintiff was arrested for simple assault.  Defreitas Dep. at 13.  Plaintiff has been incarcerated at MCCF more than
once, but believes this was the first time he was incarcerated without his prosthetic leg.  Defreitas Dep. at 11, 27-28.

[2] Plaintiff's Statement of Undisputed Facts.

prosthetic leg or crutches to assist him.[4]  Doc. No. 58-1 at ¶¶ 2, 4.  Throughout his

incarceration, Plaintiff kept a journal, in which he documented many of his thoughts

about his disability, incarceration, and medical care.[5]

MCCF is a prison divided into general population and restrictive housing units,

such as maximum security and disciplinary segregation.  Doc. No. 58-1 at ¶ 8.  The

facility offers various forms of recreation to inmates in the general population, such as

yard recreation, gym recreation, and weight room recreation.  Doc. No. 58-1 at ¶ 10.

MCCF has an inmate grievance procedure, which is explained to inmates in the

guidelines issued by MCCF and posted on the housing section wall.  Doc. No. 61 at ¶ 22.

Plaintiff admitted signing the acknowledgment of receipt for these guidelines and stated

that he was "probably aware" of the grievance procedure.  Doc. No. 61 at ¶ 22.  However,

Plaintiff claims that grievance forms were hard to come by.

MCCF also allows inmates to submit medical requests.  CMC and its staff have

the primary responsibility of providing medical care to inmates at MCCF.  Doc. No. 61 at

¶ 7, Doc. No. 60 at ¶ 4.[6]  When plaintiff was admitted to MCCF, he was experiencing

symptoms of withdrawal.[7]  Doc. No. 60 at ¶ 4.  Additionally, when plaintiff entered

---

[3] Defendants', Montgomery County and the Montgomery County Correctional Facility, Statement of Undisputed Facts.

[4] Plaintiff lost a leg in an accident in 1985.  Defreitas Dep. at 10.

[5] For example, on September 14, 2008, Plaintiff wrote that he was "not allowed in the gym or weight room[]" so he sent a request to Capt. Palmer.  The plaintiff also stated that he believed he was being discriminated against as a result of his disability.  Doc. No. 60 at ¶ 23.

[6] Defendant's, Correctional Medical Care, Inc., Statement of Undisputed Facts.

[7] On July 21, 2008, plaintiff was provided with pain medicine and allowed to self-administer.  Doc. No. 60 at ¶ 5.

MCCF, he was using crutches, rather than a prosthesis, to walk.[8]  Doc. No. 61 at ¶ 4,

Doc. No. 60 at ¶ 4.

**Accommodations for Plaintiff's Disability**

Plaintiff claims that the prison failed to accommodate his disability and

consistently discriminated against him by failing to provide appropriate housing and

shower accommodations.  After intake, Plaintiff was cleared to be housed in the general

population.  Doc. No. 58-1 at ¶ 7, Doc. No. 61 at ¶ 5.  However, Dr. Carrillo, who is

CMC's Medical Director, gave a voice order stating, "no weight room, no gym until

released[.]"  Doc. No. 60 at ¶ 5.  After going through a detox process in the Medical

Department, plaintiff was taken to J-Pod, which is a general population housing unit on

the second floor of MCCF.  Doc. No. 61 at ¶ 8.

Plaintiff complained about having to go upstairs with his crutches and he was

subsequently moved to H-2, a general population unit on the first floor, and given

"bottom bunk status."[9]  Doc. No. 61 at ¶ 8.  However, H-2 was adjacent to a shower,

which caused slippery conditions.  Doc. No. 61 at ¶ 11.  Plaintiff testified that he "twisted

[his] shoulder a few times trying to catch [himself] from hitting the ground[,]" and he

submitted requests to be seen by the Medical Department as a result.  Doc. No. 61 at ¶

11-12.  Plaintiff was then moved to general population H-3, which is a high-bail pod

---

[8] These crutches were broken.  Doc. No. 60 at ¶ 8.

[9] While housed in H-2, Plaintiff was also involved in an altercation with an inmate and was pushed to the ground after calling the inmate a snitch.  Doc. No. 61 at ¶ 10.  In his journal, Plaintiff said he believed it would not have happened if he would have had his prosthetic leg. Doc. No. 65-1 at ¶ 10.

housing section for violent offenders, because that section had grab bars.  Doc. No. 61 at

¶ 13.  Plaintiff was then moved back to H-2.[10]

Plaintiff also claims that before his leg was delivered, he was forced to "hop" from

his cell into the housing section's day room to get his meal tray because he could not use

his crutches and carry the tray at the same time.  Doc. No. 61 at ¶ 32.  Plaintiff claims this

hopping "affected [his] knee."  Doc. No. 61 at ¶ 34.  However, Plaintiff acknowledged

that many inmates ate at the tables in the day room.  Doc. No. 61 at ¶ 33.  Plaintiff never

filed a grievance concerning how trays are delivered because he felt that it was futile.

Doc. No. 61 at ¶ 34.

Plaintiff further claims that he was harassed by MCCF's correctional officers, who

were often cruel or indifferent to his disability.  He claims the officers "made jokes about

[his] one leg."  On one occasion, Correctional Officer Daniel Tressel pressed the release

button for Plaintiff's prosthetic leg during a routine pat-down search.  Doc. No. 61 at ¶

35.  Officer Tressel stated that he accidentally pushed the button and did not recall

whether Plaintiff warned him about the release button.[11]  Doc. No. 61 at ¶ 35.

**Plaintiff's Medical Requests**

Plaintiff continuously submitted medical requests and grievance forms over the

course of his incarceration.  He believed many of these requests were a result of his

---

[10] Plaintiff never filed any grievances about his moves from one housing pod to another, the lack of a shower chair in the shower, or his cells that were close to shower areas.  Doc. No. 61 at ¶¶ 40-42.

[11] Plaintiff claims that Officer Tressel pushed the button intentionally because Plaintiff had warned him not to.  Doc. No. 61 at ¶ 35.  Plaintiff did not suffer any physical injury from the incident and did not file a grievance report. Doc. No. 61 at ¶ 36.

disability.[12]  Plaintiff complains that the six-week long endeavor to obtain his prosthetic

leg was the result of discrimination.[13]  However, he admits that he never filed a grievance

report about receiving his leg.  Doc. No. 61 at ¶ 37.

Very shortly after his arrival, on July 30, 2008, Peter Michener, a third party

provider who had worked with Plaintiff's prosthetics in the past, attempted to drop off

plaintiff's leg and fit him for it that afternoon.[14]  Doc. No. 60 at ¶ 9.

In the first week of August, Plaintiff submitted six (6) medical requests on August

3, 5, 7, 8, 9, and 11.  Doc. No. 60 at ¶ 13.  These medical request forms do not mention

Plaintiff's prosthetic, but instead seek medical attention for various ailments.  Doc. No.

60 at ¶ 16.  Plaintiff also submitted medical request forms on August 21, 27, 29, 31 and

September 2 and 7 for a variety of issues including blood pressure, headaches, dizziness,

a hurt knee and weakness.  Doc. No. 60 at ¶¶ 17-22.  Additionally, Plaintiff saw CMC

nurses and received medication from them three times a day, seven days a week.  Doc.

No. 60 at ¶ 15.  Plaintiff states that he does not "have a problem with Correctional

Medical Care" or Dr. Carrillo.[15]  Doc. No. 60 at ¶ 14.

---

[12] On November 17, 2008, Plaintiff submitted a Medical Request Form because he sustained a broken tooth during a physical altercation with another inmate; however, Plaintiff refused dental care stating "don't trust you."  Doc. No. 60 at ¶ 79.  Plaintiff wrote in his journal that he did not believe the incident would have happened had he been wearing his prosthetic leg.

[13] Plaintiff does note the two MCCF social workers, Bill Anastacio and Albert Ianozzi, were both helpful with his efforts to obtain the prosthetic.  Doc. No. 61 at ¶ 37.

[14] Mr. Michener left a handwritten note for an individual named "Brian," who has remained somewhat of a mystery. During depositions, Plaintiff asked CMC's Health services Administrator, Nikki Holler about the incident, and Ms. Holler stated that she has "never known it to be possible for somebody to write a note and see somebody the same exact day…"  Doc. No. 60 at ¶ 11.

[15] Plaintiff also called CMC nurse, Marjorie Lengel, "Nurse Sunshine" or "my sunshine" because of kind actions toward him. Doc. No. 60 at ¶ 81.

Plaintiff's journal entries in September indicate that he was displeased about not being able to access the gym, yard, and weight room due to his crutches. However, Plaintiff failed to request or address his prosthetic leg in any of the request forms that he submitted. Doc. No. 60 at ¶¶ 35-36, 39, 50-51, 60, 71-72, 85, and 87. Plaintiff did, however, address multiple other medical grievances, which were subsequently addressed by CMC nurses or doctors. Doc. No. 60 at ¶¶ 43, 54, 60, 71-72, 85, and 87. These requests ranged from complaints of cold sores on September 17, 2008, to osteoarthritis on October 16, 2008. Additionally, Plaintiff was seen by CMC in response to these requests generally within a week and even as soon as the same day. Doc. No. 60 at ¶¶ 43, 54, 60, 71-72, 85, and 87. Although none of these Medical Request Forms or Inmate Grievance Forms mentioned Plaintiff's prosthetic leg, he claims that he verbally requested his prosthesis on a number of occasions. Doc. No. 60 at ¶ 39.

On October 8, 2008, MCCF Corporal Hoy suggested that Plaintiff seek to obtain a prosthetic leg, so that he could have access to the gym and weight room. Doc. No. 60 at ¶ 56. Corporal Hoy followed up with Holler, who was aware of the situation and had previously discussed concerns about obtaining the prosthetic with Plaintiff.[16] Doc. No. 60 at ¶¶ 57-58. On October 16, 2008, the Plaintiff wrote in his journal that he was calling "Peter M" (Mr. Michener) about his leg and that Peter was going to try to come to the prison for a formal fitting the following week. Doc. No. 60 at ¶ 62. There is no indication that Plaintiff told anyone inside MCCF about his contact with Mr. Michener.

---

[16] Holler stated that the cords and things like that are always questioned in the prison facility. Doc. No. 60 at ¶ 58.

In fact, Plaintiff admits Mr. Michener is "slow doing what he does," and he said getting into MCCF "was a real nightmare." Doc. No. 60 at ¶ 65.

On October 21, Plaintiff called Mr. Michener telling him to contact CMC nurse, Mary Williams.  Doc. No. 60 at ¶ 68.  Plaintiff wrote in his journal on November 1, 2008, that his leg would "be here soon[,]" but ten days later he wrote that there was a problem with administration and Bill Anastacio told him that the leg was "2 expensive and they don't want to be responsible for it."  On December 4, 2008, Holler received a call from the prosthetic company stating that the leg was "ready to be delivered."  Doc. No. 60 at ¶ 86.  On December 15, 2008, Mr. Michener called to set up a visit after changing the appointment twice since the beginning of December.[17]  Doc. No. 60 at ¶ 89.  On December 19, 2008, Plaintiff was fitted for his new prosthetic leg.  Doc. No. 60 at ¶ 93.  He wrote in his journal that he was able to work-out in the weight room but that he got blisters.[18]  Doc. No. 60 at ¶ 94.

**Access to the Yard and Weight Room**

Plaintiff claims he was denied access to the prison yard and weight room as a result of discrimination due to his disability.  On September 14, 2008, he was using his crutches in the outdoor exercise yard when Corporal Palmer approached him and said he could not use his crutches in the yard because they could be used to "manipulate the

---

[17] The next day, CMC's notes reflect that the prosthesis company had changed the appointment time, and that Plaintiff needed to stop calling.  The notes also say that the final fitting time was schedule for December 19, 2008 and the Plaintiff was aware. Doc. No. 60 at ¶ 91.  Later that day, Holler sent a sent a memo to Plaintiff advising him of the appointment change and asking him to stop calling the company.  Doc. No. 60 at ¶ 92.

[18] Plaintiff submitted a medical request to be seen about his blisters for which he was timely treated.  Doc. No. 60 at ¶ 93.

wires."[19]  Doc. No. 61 at ¶¶ 15-16.  Later that day, Plaintiff wrote in his journal that he was being discriminated against because of his disability.  That same day, Plaintiff was told that he was not cleared to go into the prison weight room according to the computer system.[20]  Doc. No. 61 at ¶ 19.  A few days after these two incidents, Corporal Palmer approached Plaintiff in the gym and instructed him that he was to return to his housing pod because he could not "be in there with [his] crutches."  Doc. No. 61 at ¶ 20.

Prior to being told by Corporal Palmer that he was not permitted in the yard, Plaintiff stated that he was in the yard with his crutches "[p]robably more than ten times" before September 14.  Doc. No. 61 at ¶ 15.  Additionally, Plaintiff had used the gym and weight room between five and ten times before he was prohibited from going with his crutches.  Doc. No. 61 at ¶ 20.  He stated in his deposition that the rules at MCCF constantly changed depending on who was on duty and that his access to the weight room and yard and the way he was treated was inconsistent.[21]  Doc. No. 60 at ¶ 30.  Plaintiff also admitted that he did not believe the prison was acting pursuant to a set policy, but instead claimed that his intermittent access to the gym and weight room was due to "their inept[itude] – they don't have the ability to count beyond two."  Doc. No. 60 at ¶¶ 32-33.

---

[19] Major Ottinger testified that Mr. Defreitas was not permitted to bring crutches into the yard with the general population because the crutches could be used as a weapon or used to manipulate the razor wire on the yard's wall. However, beginning in 2011 inmates who use crutches are now allowed in the yard with the general population. Doc. No. 58-1 at ¶ 16.

[20] Plaintiff claimed that medical said he was permitted to go into the weight room, but "they never put it in the computer." Doc. No. 61 at ¶ 19. However, there is nothing in Plaintiff's medical records to show that Dr. Carrillo made any changes to the July order restricting Plaintiff from using the gym and weight room. Doc. No. 61 at ¶ 21.

[21] He describes that "[o]ne person will say you can do this and the next person will say you can't do that. And then tomorrow, it's a whole different story. Every day -- like I said, they make it up as they go along." Doc. No. 60 at ¶ 31.

However, in Holler's deposition, she stated that there was a "security protocol [] in place for the safety of … inmates..."  Doc. No. 60 at ¶ 47.  She was unaware if this protocol was written down. Doc. No. 60 at ¶ 47.

Plaintiff requested that he have access to the yard, weight room, and gym on multiple occasions.  Doc. No. 60 at ¶ 34.  On one occasion, he submitted a grievance appeal but the next day the appeal was still sitting in the box.  Doc. No. 60 at ¶ 49.  On September 17, 2008, Plaintiff submitted a grievance form that stated, "I have been denied access to the yard, gym, and weight room.  The only reason I have been given is because I am disabled and on crutches.  I would like access to recreation and fresh air like everybody else." Doc. No. 61 at ¶ 24.  Following a response, which stated medical protocol prohibited Plaintiff from entering the gym or weight room, Plaintiff filed an appeal.  Doc. No. 61 at ¶¶ 24-25.

Plaintiff admits that his access to the yard was a security issue controlled by MCCF but states that CMC could also restrict inmates with crutches or canes from the gym and the weight room due to safety concerns for the individual and others.[22]  Doc. No. 60 at ¶¶ 25-26.  Plaintiff was given multiple opportunities to be housed in the Medical Unit, which has a separate yard for recreation.  Doc. No. 60 at ¶ 27.  Plaintiff did not want to be housed in the Medical Unit because those inmates did not have access to the weight room, gym, or chapel.  Doc. No. 60 at ¶ 28.

---

[22] This is evidenced by a response from CMC stating "Medical, per protocol, cannot allow you into gym or weight room.  Yard is not our jurisdiction." Doc. No. 60 at ¶ 45; Doc. No. 61 at ¶ 24.  However, Holler explained in her deposition that "the prison security staff sets forth those rules" and that security always takes precedence over medical issues.  Doc. No. 60 at ¶ 46, 48.

On September 17, Plaintiff wrote in his journal that he had access to the yard for recreation. Doc. No. 60 at ¶ 42. Two days later, C.O. Griffin responded to Plaintiff's grievance form by telling him that he could either go out into the yard without crutches by hopping or he could recreate in the day room. Doc. No. 60 at ¶ 43. After submitting grievances, Plaintiff was permitted in the yard on October 1, 2008, for forty-five (45) minutes and on October 2, 2008, for twenty (20) minutes. Doc. No. 60 at ¶ 52.

In response to the appeal, Plaintiff met with Corporal Berger on October 7, 2008 and reviewed the security issues associated with using crutches in the yard.[23] Doc. No. 61 at ¶ 26. They also discussed the medical limitation imposed on the weight room and gym and Corporal Berger offered to have Plaintiff moved from general population to the M-4 medical housing unit, but Plaintiff rejected this option. Doc. No. 61 at ¶¶ 26-27. In the medical housing unit, Plaintiff could use a wheelchair to access the medical unit's separated yard, but library materials and religious resources are not available to inmates housed in that section. Doc. No. 61 at ¶ 26. After the meeting, Corporal Berger requested that the next shift's staff have the medical staff review the Plaintiff's privileges. Doc. No. 61 at ¶ 26.

On October 8, 2008, Corporal Hoy followed up with Plaintiff and told him that he would have access to the yard alone on his crutches every morning and that medical had cleared him to go in the weight room and the gym. Doc. No. 61 at ¶ 28. After his first few visits into the yard, Plaintiff wrote in his journal that, "Listening to the birds and the cool morning air … it was priceless…" Doc. No. 61 at ¶ 29. MCCF records indicate that

---

[23] Corporal Berger is employed by MCCF and Montgomery County. Doc. No. 58-1 at ¶ 9.

Plaintiff visited the yard six times between his October meeting with Corporal Hoy and when he received his prosthesis in December.  Doc. No. 61 at ¶ 29.  After Plaintiff received his prosthetic in December, he was given access to the yard, gym, and weight room.  Doc. No. 61 at ¶ 31.

## II.   <u>Procedural History</u>

Plaintiff filed a Complaint on November 7, 2008 and later amended in August 2009.[24]  In the Amended Complaint, Plaintiff alleged 1) violation of 42 U.S.C. § 1983 ("§ 1983) – cruel and unusual punishment; 2) violation of 42 U.S.C. § 12101, *et seq.* – Americans with Disabilities Act ("ADA") and violation of the Rehabilitation Act § 504 ("RA"); 3) Retaliation under § 1983; 4) Retaliation under the ADA and RA; and 5) Intentional Infliction of Emotional Distress.

After Defendants filed motions to dismiss, the case was referred to Magistrate Judge Caracappa.  On January 11, 2011, this Court adopted the report and recommendation dismissing Plaintiff's claims against the individual defendants, dismissing counts III, IV, and V as to all defendants, and dismissing Count II as to CMC. Plaintiff's remaining claims are Count I, § 1983 claim against the Montgomery County, MCCF, and CMC, and Count II, ADA and RA claims against Montgomery County and MCCF.  The remaining counts are against Montgomery County and Correctional Medical

---

[24] The Complaint was filed against Defendants Montgomery County Correctional Facility ("MCCF"), Montgomery County, Lieutenant Bates, Corporal Burger, Captain Carbo, Major Ottinger, Assistant Warden Catania, Assistant Warden Frey, Corporal Palmer, Deputy Warden Molyneaux, Correctional Officer Griffin, Correctional Officer Hittel, Dr. Margaret Carrilo, Correctional Medical Care, Inc. ("CMC"), Nikki Holler, and Mary Williams.  Dr. Carrillo is employed by CMC.  Exhibit B at p. 16:14-19.  Major Albert Ottinger, III is employed by Montgomery County and MCCF.  Exhibit C at p. 16:3-6.  Deputy Warden Dennis Molyneaux is employed by Montgomery County and MCCF.  Exhibit D at p. 10:3-5.

Care, Inc. and Montgomery County Correctional Facility.  Plaintiff seeks partial

summary judgment as to Count II of the Amended Complaint against Montgomery

County and MCCF.  Defendant, CMC, filed a motion for summary judgment for Count I.

Defendants, Montgomery County and MCCF filed a Motion for Summary Judgment on

all remaining counts in the Amended Complaint.

### III.   Discussion

### 1.  Count I: § 1983 claim against Montgomery County, MCCF, and CMC[25]

### A.  Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") provides at 42 U.S.C.

§1997e(a) that:

> [n]o action shall be brought with respect to prison conditions under § 1983
> of this title, or any other federal law, by a prisoner[26] confined in any such
> jail, prison or other correctional facility until such administrative remedies
> as are available are exhausted.

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the

forms of relief sought and offered through administrative avenues."[27]  Booth v. Churner,

532 U.S. 731, 741 n.6 (2001).  Exhaustion means "a prisoner must complete the

---

[25] Magistrate Judge Caracappa held in her Report and Recommendation that the Complaint adequately alleged that "the municipality and its entities maintained impermissible policies, practices, or customs with respect to the treatment of amputee inmates.  Accordingly, the Monell claims against Montgomery County and CMC survive at least the motion to dismiss stage of this action."  Defreitas v. Montgomery County, 2010 U.S. Dist. LEXIS 139432, *17 (E.D. Pa. Aug. 31, 2010).  While Plaintiff has not established what that particular policy or custom is, and Plaintiff may not be able to do so until further discovery has been made.  Id., 2010 U.S. Dist. LEXIS 139432, *15.  Therefore, Plaintiff must show the existence of a policy or custom and "Plaintiff will further have to demonstrate that the implementation of the policy or custom led to a constitutional violation."  Id., 2010 U.S. Dist. LEXIS 139432, *17.

[26] The PLRA defines a "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h).

[27] Importantly, § 1997(e)(a) expressly applies to claims "under § 1983 … and any other federal law."

administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." Woodford v. Ngo, 548 U.S. 81, 84 (2006).  Grievance procedures in inmate handbooks are administrative remedies that must be exhausted under the PLRA prior to suit. Concepcion v. Morton, 306 F.3d 1347, 1348-49 (3d Cir. 2002).

Administrative remedy exhaustion is required "even if (1) the prisoner believes such administrative remedies to be ineffective, or (2) the available administrative process cannot grant the desired remedy." Camino v. Scott, 2006 U.S. Dist. LEXIS 34893, 2006 WL 1644707 at *3 (D.N.J. 2006) (citing Booth, 532 U.S. 731, 739-41 (2001)).  Failure to exhaust administrative remedies is an affirmative defense and defendants "have the burden of pleading and proving the defense in a motion for summary judgment or at trial." Kounelis v. Sherrer, 2005 U.S. Dist. LEXIS 20070, 2005 WL 2175442, at *6 (D.N.J. Sept. 6, 2005).  Where the inmate has exhausted his or her administrative remedies as to some claims in a complaint but not others, the district court must consider the claims that were exhausted while dismissing the claims that are unexhausted. Jones v. Bock, 549 U.S. 199, 218-44 (2007).

The Plaintiff and Defendants dispute whether Plaintiff was required to exhaust his administrative remedies under The Prison Litigation Reform Act of 1995 because, although he filed his original Complaint while a prisoner at MCCF, he filed an Amended Complaint while he was no longer a "prisoner" as it is defined by the Act.  Defendant contends that Plaintiff only exhausted his administrative remedies as to his complaints about accessing the gym, yard, and weight room, but did not file any grievances, let alone

appeals, concerning, among other complaints, the showers, the housing pods, his prosthetic leg, the delivery of meal trays, and officers making jokes.[28]

Plaintiff argues that he need not have exhausted any administrative process because his Amended Complaint was filed when he was released from custody. Plaintiff also claims that aside from the yard, gym, and weight room, Plaintiff exhausted his administrative remedies concerning his prosthetic leg because his journal indicated he filed grievances concerning his leg. Additionally, Plaintiff contends that he feared retribution for filing grievances and the prison did not require prisoners to file grievances.[29]

In George v. Chronister, 319 Fed. Appx. 134, 137 (3d Cir. 2009), the Court of Appeals agreed with the District Court that for exhaustion purposes under the PLRA, the Plaintiff's status as a "prisoner" is determined at the time his complaint is "brought" or filed in court, not when the alleged incident(s) occurred. See Ahmed v. Dragovich, 297

---

[28] Other courts have addressed whether taunting is sufficient to sustain an Eighth Amendment claim. Stepney v. Gilliard, 2005 U.S. Dist. LEXIS 31889, at *19 (N.J.D. Dec. 8, 2005) ("verbal harassment and taunting is neither 'sufficiently serious' nor 'an unnecessary and wanton infliction of pain' under the common meaning of those terms. 'Verbal harassment or profanity alone . . . no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under [Section] 1983") (quoting Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998), and citing Collins v. Graham, 377 F. Supp. 2d 241, 244 (D. Me. 2005)).

[29] Frierson v. St. Francis Med. Ctr., 2011 U.S. Dist. LEXIS 85937 (D.N.J. Aug. 4, 2011) discusses a very similar argument. In that case, Plaintiff conceded that he did not file any grievances regarding his Constitutional claims in the case. Instead, he submitted twenty-nine (29) grievances concerning unrelated matters, such as his request for a pillow, a thicker mattress, special boots to mitigate his back pain, etc. The court in that case had a copy of the inmate handbook mandating the grievance procedure. The court found that because Plaintiff filed twenty-nine (29) grievances, he was clearly aware of the grievance procedure available to him and able to use it. See also, Meanor v. Wilcox, 241 Fed. Appx. 856, 858 (3d Cir. 2007) (finding that prisoner was required to exhaust his administrative remedies where he was aware of grievance procedures, even though he had not received inmate handbook). The difference in this case is that Plaintiff claims that filing grievances was not mandatory to exhaust remedies and the handbook merely indicated that an inmate may file a grievance. However, Plaintiff consistently used the grievance procedure for medical and non-medical complaints. He received medical attention and other responses based upon these grievances.

F.3d 201, 210 (3d Cir. 2002) (noting that a plaintiff is a "prisoner" under the PLRA if he was a prisoner confined in a correctional facility on the date the complaint was filed.); see also Abdul-Akbar v. McKelvie, 239 F.3d 307, 314 (3d Cir. 2001) (noting that the PLRA's exhaustion provision "requires that the plaintiff exhaust administrative remedies, but only if the plaintiff is a prisoner at the time of filing").

However, in a non-precedential opinion, Prendergast v. Janecka, 2001 U.S. Dist. LEXIS 9689 (E.D. Pa. July 10, 2001), which Plaintiff cites, the court held that the "administrative exhaustion requirement does not apply because the amended complaint was filed after plaintiff was released from prison and was no longer an inmate - even though the original complaint was filed while he was in custody." Prendergast v. Janecka, 2001 U.S. Dist. LEXIS 9689, *4 (E.D. Pa. July 10, 2001).  The decision, which is not binding on this Court, had a separate and independent reason for denying the defendant's motion to dismiss--its belief that "exhaustion may have occurred." See id. Additionally, in light of the Third Circuit's subsequent decision in Ahmed, Prendergast no longer appears to be good law.[30]

Other Circuits have addressed this specific issue.  In Prescott v. Annetts, 2010 U.S. Dist. LEXIS 75025 (S.D.N.Y. July 22, 2010), the court held that plaintiff's

---

[30] Zimmerman v. Schaeffer, 654 F. Supp. 2d 226 (M.D. Pa. 2009), deals with a somewhat different situation involving the filing of an Amended Complaint which may shed light on the unresolved state of exhaustion requirements under the PLRA.  In that case, various plaintiffs, both current and former prisoners, filed a complaint. At the time they filed the original suit and at the time they filed for leave to amend, one prisoner, Mr. Sassaman, who the plaintiffs sought to add as a plaintiff, was incarcerated.  Zimmerman v. Schaeffer, 654 F. Supp. 2d 226, 258 (M.D. Pa. 2009).  However, by the time the plaintiffs were granted leave and filed the amended complaint, Mr. Sassaman was no longer a prisoner.  Id.  The court found that Mr. Sassaman did not become a party until the second amended complaint was actually filed, on February 15, 2008.  Accordingly, because Sassaman was not a prisoner at the time he filed suit, he was not subject to the exhaustion requirement of the PLRA.  Id.

argument that because he filed an amended complaint after his release from custody, the PLRA's exhaustion requirement did not apply failed.  The court found that the argument was contrary to the plain language and purpose of the PLRA, and at odds with numerous decisions in this and other circuits.  Prescott v. Annetts, 2010 U.S. Dist. LEXIS 75025, *8 (S.D.N.Y. July 22, 2010).  It went on to say the word "brought" means commenced.  Id. at *9.  Thus, "the plain language of the PLRA dictates that the determination of whether a plaintiff is a prisoner—and therefore subject to the exhaustion requirement—is made when the initial complaint is filed."  Id. (citing Porter v. Nussle, 534 U.S. 516 (2002); Harris v. Garner, 216 F.3d 970, 981 (11th Cir. 2000)).

    Plaintiff was required and failed to exhaust his administrative remedies, therefore, Plaintiff cannot base his § 1983, ADA or RA claims upon any conditions of his confinement other than the alleged denial of his access to the yard, gym, or weight room.  See  Ahmed v. Dragovich, 297 F.3d 201, 210 (3d Cir. 2002).  Plaintiff consistently used the grievance procedure for medical and non-medical complaints.  He received medical attention and other responses based upon these grievances.  There is simply no evidence presented that supports Plaintiff's claims that he exhausted his remedies concerning complaints about his prosthetic, shower, and housing issues.  Plaintiff must show that these deprivations resulted in a constitutional violation in order to prove his Monell claim.

## B.  Plaintiff's Claims under Section 1983

    Plaintiff argues that Defendants subjected Plaintiff to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States

Constitution.  They had a duty to provide humane conditions of confinement for Plaintiff, and that by engaging in the acts set forth above, the Defendants acted with deliberate indifference to Plaintiff's constitutional rights.  Plaintiff claims that Defendants are liable under § 1983 because they had a policy or custom of treating disabled inmates in this manner.

To state a cause of action under §1983, Plaintiff must prove that (1) Defendants acted under color of state law; and (2) Defendants deprived Plaintiff of a federal right.  It is well-settled that neither a state nor its agencies is a "person" as that term is used in §1983 and, thus, not subject to suit.  Hafer v. Melo, 502 U.S. 21, 25-27 (1991).  In Monell v. N.Y. City Dep't of Soc. Servs., the Supreme Court rejected institutional liability based upon the doctrine of respondeat superior.  Monell v. City of New York Department of Social Services, 436 U.S. 658 (1978).  Therefore, Montgomery County and CMC are liable only if Plaintiff demonstrates "that the municipality [or private corporation] itself, through the implementation of a municipal policy or custom, cause[d] a constitutional violation." [31]  Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991)(citing Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 691-95 (1978).

Thus, the first inquiry is whether or not Defendants' actions, as alleged by Plaintiff, constitute a policy or custom.  Second, is whether or not that policy or custom, as alleged and viewed in the light most favorable to Plaintiff, violates a constitutional right.  A local government's "policy" is a "statement, ordinance, regulation or decision

---

[31] In this case, a private corporation, like CMC, can be liable when it is alleged to be acting under color of state law. See Natale v. Camden County Correctional Facility, 318 F.3d 575, 583-84 (3d Cir.2003).

officially adopted and promulgated by [a local governing] body's officers."[32] <u>Simmons v. City of Philadelphia</u>, 947 F.2d 1042, 1059 (3d Cir.1991) (citing <u>Monell</u>, 436 U.S. at 690).[33]

Under the Eighth Amendment, "extreme deprivations are required to make out a conditions-of-confinement claim.[34]  Basic routine discomfort is 'part of the penalty that criminal offenders pay for their offenses to society,' 'only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation.'"  <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992). To prevail on a conditions-of-confinement claim, a plaintiff must show: (1) that the prison conditions pose a substantial risk of harm; and (2) that the prison official was deliberately indifferent to that risk.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994); <u>see also</u> <u>Griffin v. Vaughn</u>, 112 F.3d 703, (3d Cir. 1997); <u>Tillman v. Lebanon Cty. Correctional Facility</u>, 221 F.3d 410, 418 (3d Cir. 2000).  In some instances, failure to provide proper accommodations for handicapped inmates has been found to violate their Eighth Amendment right to be free from cruel and unusual punishment.  <u>See e.g.</u> <u>Kwasi</u>

---

[32] A local government's "custom," which lacks the formal approval of a policy, requires a showing of practices that are "so permanent and well settled to constitute a custom or usage with the force of law."  <u>Simmons v. City of Philadelphia</u>, 947 F.2d 1042, 1059 (3d Cir.1991) (citing <u>Monell</u>, 436 U.S. at 691).  In order to satisfy <u>Monell</u>, a plaintiff must show that a policymaker for the defendant entity authorized the policies that caused the violations or permitted practices that were so permanent and well settled as to essentially have the force of law.  See <u>Messa v. Foley</u>, 1993 WL 106519, *3 (E.D. Pa. 1993), <u>aff'd</u>, 17 F.3d 1430 (3d Cir. 1994).

[33] "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under [Monell]."  <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823–24 (1985); <u>Casilla v. New Jersey State Prison</u>, No. 05-4590, 2009 WL 2148012 (D.N.J. July 16, 2009) ("Plaintiff must show that a constitutional deprivation resulted from an official custom or policy or, alternatively, from the actions of an official with "final authority to establish municipal policy").  <u>See also</u> <u>Natale v. Camden County Correctional Facility</u>, 318 F.3d 575, 583-84 (3d Cir.2003).

[34] Additionally, in order to make out a Fourteenth Amendment claim "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." Hubbard v. Taylor, 538 F.3d 229, 232 (3d Cir. 2008)).

Sekou Muhammad v. Dep't of Corr., 2008 U.S. Dist. LEXIS 92149, *38 (D.N.J. Nov. 12, 2008) (denying summary judgment on an amputee inmate's Eighth Amendment claims finding the jury could conclude prison officials acted with deliberate indifference when they transferred him to an upper bunk on the second floor).

In regard for medical needs in the prison context, the Eighth Amendment proscribes "[o]nly unnecessary and wanton infliction of pain or deliberate indifference to the serious medical needs of prisoners."[35] Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Estelle v. Gamble, 429 U.S. 97, 106 (1976); DeFranco v. Wolfe, 387 Fed. Appx. 147, 2010 WL 2762968, *10 (3d Cir. 10).  The Third Circuit has interpreted this to mean that there are two prongs to the inquiry: (1) deliberate indifference on the part of prison officials;[36] and (2) the prisoner's medical needs are serious.[37] Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir.1987); Rouse v. Plantier, 182 F.3d

---

[35] Inmates do not have a constitutional right to a prison grievance system.  Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 137-38 (1977); Speight v. Sims, No. 08-2038, 283 Fed. Appx. 880, 2008 WL 2600723 at *1 (3d Cir. June 30, 2008) ("[T]he existence of a prison grievance procedure confers no liberty interest on a prisoner."). Consequently, dissatisfaction with response to an inmate's grievances does not support a constitutional claim.  See also Pryor-El v. Kelly, 892 F. Supp. 261, 275 (D. D.C. 1995) (because prison grievance procedure does not confer any substantive constitutional rights upon prison inmates, the prison officials' failure to comply with grievance procedure is not actionable).  See also Cole v. Sobina, No. 04-99J, 2007 U.S. Dist. LEXIS 93322, 2007 WL 4460617, at *5 (W.D. Pa. Dec. 19, 2007) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern.").

[36] Deliberate indifference is more than an "inadvertent failure to provide adequate medical care."  Estelle, 429 U.S. at 105.  It is more than mere negligence or medical malpractice without some more culpable state of mind.  Id. at 106; Rouse, 182 F.3d at 197; Lanzaro, 834 F.2d at 346.  It requires "obduracy and wantonness ... [,] which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk."  Rouse, 182 F.3d at 197. Deliberate indifference is a subjective inquiry, while risk of harm is evaluated objectively.  Atkinson v. Taylor, 316 F.3d 257, 262 (3d Cir. 2003).  Moreover, the standard is a "stringent standard of fault requiring proof that a [state official] disregarded a known or obvious consequence of his action."  Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997) (emphasis added).

[37] The Third Circuit has also described what constitutes a serious medical need.  "A medical need is 'serious,' in satisfaction of the second prong of the Estelle test, if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth Cnty Corr. Inst. v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  Atkinson v. Taylor adds that a serious medical is one for which "the denial of treatment would result in the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss."  Atkinson v. Taylor, 316 F.3d 257, 272-73 (3d Cir. 2003).

192, 197 (3d Cir.1999).  A prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference.  Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).

In Kwasi Sekou Muhammad v. Dep't of Corr., 645 F. Supp. 2d 299, 315 (2008), the Court found that plaintiff's evidence was sufficient to raise a jury question as to deliberate indifference.  Although plaintiff requested a bottom bunk, one was not provided.  Accessing an upper bunk was unsafe and caused Plaintiff great pain in his amputated limb and back.  Plaintiff was totally incapable of using the showers on the second floor and he was unable to access the first-floor, handicapped-accessible shower because, due to his disability, he was unable to descend the flight of stairs before non-disabled inmates occupied the shower.  Defendants in that case made no accommodations for plaintiff's sleeping or showering arrangements and made no offers of accommodations.  Id. at 316.

In Frost v. Agnos, 152 F.3d 1124, 1129 (9th Cir. 1998), the court reversed the district court's entry of summary judgment as to the issue of whether an inmate with a broken leg had an Eighth Amendment right to shower in a handicapped-accessible facility.  Id.  The court explained that

> although we recognize the wisdom of deferring to prison officials' considered judgment regarding the proper way to administer a prison, Procunier v. Martinez, 416 U.S. 396, 405, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974), Defendants are not excused from taking reasonable measures to assist Frost in showering safely.  Frost suggests a variety of options that he alleges would have met his safety needs.  For example, he contends that he would have been aided by a chair in the shower, a handicapped bar, or the provision of extra guards to assist him.  The fact that such basic steps could have better guaranteed Frost's safety provides evidence that Defendants

were deliberately indifferent in failing to provide any accommodations whatsoever.

Frost v. Agnos, 152 F.3d 1124, 1129 (9th Cir. 1998).  The court ultimately concluded that a triable issue of fact existed with regard to whether the failure to provide Frost with adequate shower facilities resulted in the violation of his constitutional rights.  Id.

Plaintiff claims that the Defendants violated his Eighth Amendment rights by confining him in prison without access to the yard, gym and weight room and failing to schedule an appointment to obtain a prosthetic leg.  He claims to have identified various instances that tend to show a policy or custom instituted by Defendants.  For instance, Plaintiff notes Ms. Lengel testified about a "policy" having to do with injured inmates and CMC responded to a grievance denying him access to the weight room and gym "per protocol."  Plaintiff also claims there was a policy, which prohibited him from having his prosthetic in prison because it was too expensive.

Defendant, CMC, argues that Plaintiff was only deprived of the weight room and gym for a short time, for good reasons, and Plaintiff did not have either the legal or the constitutional right to those two specific types of recreation.  Moreover, Plaintiff rejected other alternatives for recreation, such as the medical yard and the day room.  CMC contends that it attempted to accommodate Plaintiff by arranging for alternative work-out areas and yards, and, therefore, it did not act with anything resembling a sufficiently culpable state of mind.

County Defendants argue Plaintiff has no evidence that the policymaker of the County (generally the Board of Commissioners) or of MCCF (its Warden) established a policy or acquiesced in a custom that violated Plaintiff's constitutional rights.  Plaintiff admitted that he went to the yard with his crutches "[p]robably more than ten times" between arriving at MCCF on July 18, 2008, and being told by Corporal Palmer on September 14, 2008, that he could not take his crutches to the yard, which is not strong evidence of a custom or policy.[38]  Defendants state that Plaintiff admits that he failed to file grievances about his prosthetic leg, how his meal trays were delivered, any incidents of the officers mocking him, the locations of his cell, and the conditions of the shower.  However, the grievances (and appeal) he did file resulted in restored access to the weight room and gym in short order.  Finally, the Plaintiff testified that there was no policy at MCCF, in fact, Plaintiff complains of a lack of consistent action.

Plaintiff has the burden of coming forward with evidence in response to a motion for summary judgment.  Upon a careful consideration of the facts in this case, I find that Plaintiff has failed to point to evidence sufficient to show the Defendants were deliberately indifferent to his serious medical needs under the subjective prong such that his claim can survive a summary judgment motion.  Although Plaintiff's Complaint suggested that the Defendants may have treated him, a disabled inmate, in accordance with an accepted practice, he has failed to establish, with the benefit of discovery, what that particular policy or custom is.

---

[38] Defendants note that Plaintiff was not prohibited from going into the yard.  However, they could not allow him in the yard with crutches.  They state that Plaintiff could have gone into the yard without them.

Simply because a response issued by CMC used the word "protocol" is not sufficient to show that there was a custom treatment of disabled inmates. Aside from the Plaintiff's testimony, there is no evidence of record to indicate that the incident regarding the CMC nurse who allegedly delivered crutch tips ever occurred. In fact, contrary testimony by CMC nurse, Ms. Holler, states that crutch tips are easily replaced if an inmate makes a request. Additionally, the evidence shows that the vast majority of Plaintiff's grievances were responded to within a week. Plaintiff also had strict demands that he be seen by doctors as opposed to nurses or physician assistants and he refused dental care when offered on one occasion after filing a grievance requesting it. Defendants did not intentionally deny or delay access to medical care or intentionally interfere with medical treatment once it was prescribed.

Plaintiff has no evidence that the Warden or the Commissioners established any policy. Plaintiff continually testified that the rules inside MCCF kept changing and that he did not think there was a set policy because no one knew what anyone else was doing. This is evidenced by Plaintiff's experiences regarding the exercise facilities and is the antithesis of a policy or custom, which the Plaintiff is required to identify and prove under Monell.

Even if Plaintiff had provided sufficient evidence to show a policy or custom, the allegations regarding the conditions of his confinement, taken in a light most favorable to him, simply do not rise to the level of a constitutional violation.[39] Plaintiff has not shown

---

[39] Although Plaintiff has not exhausted his administrative remedies pertaining to a number of his complaints concerning his treatment and conditions in the prison, I will include them in the discussion of whether any treatment

that he has suffered from any serious health problems due to the actions of these Defendants or to the medical care he received while housed at MCCF.  Additionally, there is insufficient evidence to support that disallowing Plaintiff to access the yard was an effort to punish Plaintiff, in violation of the Fourteenth Amendment.  Instead, Defendants argue it was for legitimate governmental objective – preventing the use of crutches as weapons in circumstances where inmates are in groups without a guard present.[40]

This case is factually distinguishable from Frost and Casey because the Defendants continually responded to grievances by accommodating Plaintiff's disability. In the cases cited by Plaintiff, the handicapped individuals were deprived of the ability to shower or get into a bunk bed; whereas, in this case, the Plaintiff was consistently accommodated by Defendants.  He was moved several times to keep his cell away from slippery floors and to keep him from having to walk up flights of stairs.  Plaintiff was also afforded bottom bunk status.  Defendants repeatedly gave the Plaintiff opportunities to move into the handicapped accessible medical wing of the prison – something which the Plaintiffs in both Frost and Casey were denied.  He was seen by medical personnel and allowed to administer many of his own medications.  Furthermore, CMC consistently responded to Plaintiff's numerous medical requests.  Although Plaintiff complains of twisting his shoulder when he almost slipped in the shower, unlike the plaintiffs in Frost

---

rose to a level of a constitutional violation. Even with all of Plaintiff's allegations concerning his prosthetic and his housing accommodations, he fails to show a constitutional violation required under Monell.

[40] I find this to be an important Government concern.

and Casey, he never fell in the showers, and he never injured himself getting in and out of bed.

Plaintiff has not provided any evidence that could raise a genuine issue of material fact regarding the condition of his confinement.  The record shows that the prison complied with constitutional standards at the most basic level, and Plaintiff does not provide any evidence from which a reasonable jury could conclude that his health and safety were at risk.  See Hassine v. Jeffes, 846 F.2d 169, 174-75 (3d Cir. 1988).  Plaintiff does not provide any evidence to show that as a consequence of his limited access to the yard, gym, or weight room, he suffered any serious physical harm.[41]  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

Concerning receipt of the prosthetic, whether or not Plaintiff exhausted the administrative requirements before filing suit, Plaintiff has not identified a single CMC policy, custom, direction, or practice relevant to obtaining his prosthetic leg.  Although there is record of a written response to one of his grievances "Medical, per protocol," the factual record reveals no such policy or "protocol" by any of the Defendants to deprive Plaintiff of his prosthesis or of his crutch tips.[42]  Further, other than plaintiff's conclusory allegations that he verbally requested his prosthetic, the record does not suggest that he

---

[41] Consider also, Bell v. Wolfish, 441 U.S. 520, 546-47, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (maintaining institutional security and preserving internal order are essential goals that may require limitation on the constitutional rights of prisoners); see also, Young v. Quinlan, 960 F.2d 351, 363-64 (3d Cir. 1992).

[42] It should be noted that Plaintiff received both his crutch tips and his prosthetic before being released from incarceration.

filed grievances until much later in his period of incarceration.[43]   Additionally, after

Defendants worked with Plaintiff's third party provider to set up a number of

appointments, he eventually received his prosthetic.   Defendants are entitled to summary

judgment on plaintiff's claim that he was discriminated against because the prison failed

to provide the prosthesis.

Even if Plaintiff had identified a relevant policy or procedure, that policy or

procedure did not cause a constitutional deprivation.   The duration of confinement in the

alleged condition is relevant in determining whether a constitutional violation exists.

Hutto v. Finney, 437 U.S. 678, 686 (1978).   Thus, the longer the prisoner is without such

benefits for handicapped individuals, the closer it comes to being a constitutional

violation.   Id.   Although Plaintiff presented instances in which he did not receive access

to the yard or gym or his prosthetic leg, he did not establish that those examples rise to

the levels of constitutional violations.

Plaintiff simply showed that he was deprived of the opportunity to use his crutches

in the yard, weight room, and gym for a short time while MCCF and CMC personnel

addressed his grievance and appeal.   Although exercise is "one of the basic human

necessities protected by the Eighth Amendment," Peterkin v. Jeffes, 855 F.2d 1021, 1031

(3d Cir. 1988), "a temporary denial of exercise with no medical effects is not a

substantial deprivation."   Bank v. Nicklin, 2011 U.S. Dist. LEXIS 9941, 2011 WL

397651 at *7 (M.D.Pa. Feb 2, 2011).   Lack of exercise may rise to a constitutional

violation only if it "poses a significant threat to an inmate's physical and mental well-

---

[43] See Davoll v. Webb, 194 F.3d 1116, 1133 (10th Cir. 1999) (employee seeking reasonable accommodation bears burden of initiating process with employer).

being.  For example, lack of exercise may constitute cruel and unusual punishment where 'movement is denied and muscles are allowed to atrophy.'"  <u>Tapp v. Proto</u>, 718 F. Supp. 2d 598 (E.D. Pa. 2010)(quoting <u>Platt v. Brockenborough</u>, 476 F. Supp. 2d 467, 471 (E.D. Pa. 2007); <u>French v. Owens</u>, 777 F.2d 1250, 1255 (7th Cir. 1985)).  <u>See also</u>, <u>Torrealba v. Hogsten</u>, 2009 U.S. Dist. LEXIS 93992 (M.D. Pa. Oct. 8, 2009) (holding that loss of privileges, in general, does not amount to infliction of cruel and unusual punishment; and loss of recreation privileges is no exception to this rule).[44]  Moreover, the Plaintiff was permitted to recreate in the "day room."  Plaintiff has not shown that he has suffered any tangible physical or psychological harm as a result.  Further, Plaintiff has offered no facts suggesting that Defendants' conduct in reducing the amount of recreation time afforded to inmates on crutches was "unnecessary" or "wanton," or that Defendants "disregard[ed] an excessive risk to inmate health or safety."  <u>Redden v. Ricci</u>, 2008 U.S. Dist. LEXIS 95000, *11 (D.N.J. Nov. 20, 2008).

In the Fourth Circuit, courts have held the constitution does not require out-of-cell exercise, but the near total deprivation of the opportunity to exercise may violate the Eighth Amendment unless the restriction relates to a legitimate penological purpose. <u>Mitchell v. Rice</u>, 954 F.2d 187, 191-192 (4th Cir. 1992).  <u>But see</u>, <u>Spain v. Procunier</u>, 600 F.2d 189, 199 (9th Cir. 1979) (denial of outdoor exercise amounted to cruel and unusual punishment).  Although Plaintiff has arguably not been afforded the requisite of amount

---

[44] It is important to note that many cases in the Third Circuit finding that the restriction on exercise did not rise to a constitutional violation were at most two weeks of deprivation.  <u>See</u> <u>Bensinger v. Capt</u>. 1995 U.S. Dist. LEXIS 455, No. Civ. A. 94-1532, 1995 WL 30609 at *2 (E.D.Pa. Jan. 18, 1995) (denial of exercise for four days was not a constitutional violation in the absence of allegations of resulting harm).  However, none discuss whether plaintiffs had access to a "day room" in those situations.

of recreation as permitted by regulation, he has received some recreation, such as his

opportunity to recreate in the day room, and has not demonstrated an objectively serious

deprivation as contemplated by the Eighth Amendment, nor is there evidence that the

deprivation has resulted in any substantial injury.  See Bacon v. Minner, 229 Fed. Appx.

96, 99 (3d Cir. 2007) (holding that an Eighth Amendment claim could not stand where

the prisoner "merely alleged a … reduction [] in the recreation schedule . . . rather than a

complete elimination of exercise").[45]

Plaintiff did not file repeated grievances requesting his prosthetic leg.[46]  Plaintiff

does not show that the delay rose to a federal constitutional violation of deliberate

indifference when the process for obtaining his prosthesis took only six (6) weeks after

his initial medical request and the supplier of that prosthesis, not Defendants, delayed

delivery by canceling previously scheduled fitting appointments.[47]  In fact, in Casey v.

Lewis, 834 F. Supp. 1569, 1582 (D. Ariz. 1993), the court found that there was no

constitutional violation when an inmate received his leg prosthesis unit from an outside

provider within seven (7) weeks of the initial request.  Moreover, even if the Court

accepts Plaintiff's argument that he mentioned his prosthesis and made verbal requests as

---

[45] Additionally, the conduct and intent of the prison officials in this case cannot be characterized as deliberate indifference because they responded reasonably.  For example, the court in Takuma v. Ricci, 2008 U.S. Dist. LEXIS 71119 (D.N.J. Sept. 16, 2008) found defendants' conduct to be reasonable and found no Eighth Amendment violation where plaintiff filed a grievance and the defendants responded and looked into alleviating the lack of recreation issue. Takuma v. Ricci, 2008 U.S. Dist. LEXIS 71119, *11 (D.N.J. Sept. 16, 2008).

[46] This fact, revealed in discovery, is contrary to Plaintiff's assertions in his Complaint and on which Magistrate Judge Caracappa relied in making her Report and Recommendation.

[47] It should be noted that there is evidence that Plaintiff discussed his prosthetic when he was admitted to MCCF and that he had conversations with some officers regarding his prosthetic. See e.g. Plaintiff's Exhibit Anastacio 1 to Exhibit 10.  However, the first medical request concerning obtaining his leg from Mr. Michener came much later.

long as five (5) months prior to his receipt of the prosthetic, Plaintiff still fails to show that this was a serious medical need, that the Defendants were deliberately indifferent, or that he suffered a constitutional violation.  Because Plaintiff has failed to produce evidence from which a reasonable jury could conclude that the Defendants acted with deliberate indifference causing a constitutional violation, I will grant the Defendants' motion for summary judgment on Count I.

## 2.  Count II: 42 U.S.C. § 12101, et. seq: Americans with Disabilities Act and Rehabilitation Act § 504 claims against Montgomery County and MCCF

The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Similarly, § 504 of the RHA states, "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity concluded by and Executive agency..." 29 U.S.C. § 794.  Prisons fall "squarely within the statutory definition of public entity." 42 U.S.C. § 12132.

To state a claim for violation of either the ADA or RHA, plaintiff must show that he: (a) has a disability, (b) is otherwise qualified to participate in a program, and (c) was denied the benefits of the program or discriminated against because of the disability.

Bowers v. NCAA, 118 F.Supp.2d 494, 511 (D. N.J. 2000).[48]  "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation."  Robertson v. Las Animas County Sheriff's Dept., 500 F.3d 1185, 1197-98 (10th Cir. 2007).

Under the ADA and the Rehabilitation Act, public entities are to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7), or would produce undue burden.  28 C.F.R. § 35.150(a)(3); see also, Juvelis v. Snider, 68 F.3d 648, 653 (3d Cir. 1995) (§ 504 of the Rehabilitation Act "requires some affirmative steps to accommodate handicapped persons").  To be "reasonable" the accommodation or modification must give disabled prisoners "meaningful access" to the service, program, or activity in question.  Alexander v. Choate, 469 U.S. 287, 301 (1985); 29 U.S.C. § 794; 28 C.F.R. § 35.130(b)(7); see also The Americans with Disabilities Act Title II Technical Assistance Manual, § II-3.6100 (requiring public entities to make reasonable modifications to their policies, practices, or procedures to avoid discrimination).  Thus, "virtually every interaction between prison officials and disabled inmates potentially exposes the State[] to liability . . . unless the

---

[48] "Whether suit is filed under the Rehabilitation Act or under the [ADA], the substantive standards for determining liability are the same."  McDonald v. Pennsylvania Dept. of Public Welfare, 62 F.3d 92, 94 (3d Cir. 1995).  Thus, case law applying the two laws is interchangeable.

State[] promptly provide[s] reasonable accommodation." Chisolm v. McManimon, 275 F.3d 315, 327-30 (3d Cir. 2001)).

In prison situations, courts must use caution when applying anti-discrimination statutes to give weight to the unique needs of prison administration.  If the challenged prison policies concerned security, then they "are 'peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" Turner v. Safley, 482 U.S. 78, 86 (1987) (quoting Pell v. Procunier, 417 U.S. 817, 827 (1974)); Brooks v. Horn, 2004 U.S. Dist. LEXIS 6240 (E.D. Pa. Apr. 7, 2004).

In Purcell v. Pennsylvania Dep't of Corrections, 1998 U.S. Dist. LEXIS 105 (E.D. Pa. Jan. 9, 1998), the court denied the DOC's motion for summary judgment against a prisoner's claims of discrimination because whether the prisoner's health problems constituted a "disability" under the ADA was a trial issue.  Further, the court found that the prison was required to accommodate the Plaintiff's Tourette's in a reasonable manner allowing him to remain in a handicapped-accessible cell or have a chair in his cell and the shower room.  The court recognized the need for deference when the challenged policies concern security, but determined that those considerations were not warranted.  Purcell, 1998 U.S. Dist. LEXIS 105, at *29.

There is no dispute the Plaintiff qualifies as having a disability.  See Purcell v. Pennsylvania Dep't of Corr., Civil Action No. 95-6720, 1998 U.S. Dist. LEXIS 105, at *20 (E.D. Pa. Jan. 9, 1998) (holding that an inmate can be a qualified individual with a

disability).  Further, use of the exercise facilities, yard, and showers are considered

services, programs, or activities under the ADA and the RA.[49]  The only question is

whether a material fact exists as to the Defendants' discrimination based on the Plaintiff's

disability.

Plaintiff argues that the Defendants were obligated to and failed to make

reasonable accommodation for Plaintiff's disability and that they discriminated against

him by denying him access to the yard, weight room, and gym because he required

crutches to ambulate.[50]  Plaintiff contends that security was not an issue with regard to

the weight room and gym access and, therefore, the Defendants should be given no

deference and that, to the extent that the County Defendants argue their restriction from

the yard, gym and weight room was based on security concerns, their argument is

insufficient to overcome Plaintiff's motion for summary judgment.  Plaintiff also notes

that the County Defendants refused to provide Plaintiff with several accommodations that

had been requested or that were obviously needed, such as Mr. Defreitas' prosthetic leg,

the wheelchair ramp, or the shower chair or grab bar.

Defendants argue that Plaintiff presented the County Defendants with a request to

accommodate his use of crutches in the yard, weight room and gym, and within thirty

(30) days the Defendants conducted a dispute resolution and appeal that led to Plaintiff's

---

[49] An inmate may be able to establish a Title II failure-to-accommodate claim if he is unable to access the prison's exercise equipment.  Thomas v. Pa. Dep't of Corrs., 615 F. Supp. 2d 411, 425 (W.D. Pa. 2009) (Magistrate judge recommended summary judgment against inmate's Title II claim because, inter alia, he could not demonstrate a continued inability to access exercise equipment and dining facilities).

[50] Plaintiff contends that although Defendants argue they eventually provided Plaintiff with access, the duration of the denial is relevant only for the purposes of determining damages in this case, not liability.

restored ability to use crutches in the yard, weight room, and gym.  Defendants also accommodated Plaintiff by frequently moving his housing to accommodate his disability.[51]

Defendants argue that Plaintiff never testified that he requested a shower seat during the incarceration at issue, and there is no evidence of record of such a request. Plaintiff testified only to the vague possibility that he "might have filed a request slip" saying his shower "wasn't handicap equipped."  Exhibit B at 113-114.  Plaintiff admits that he never filed a grievance seeking to have a chair in his shower and never filed a grievance concerning the conditions of the showers generally.  *Id.*  Plaintiff also never filed any grievance about having to hop to get his meal trays, and, in fact, hopping was not necessary as Plaintiff could have eaten his lunch in the dayroom with other inmates. Additionally, considering the timing and the number of requests, the County Defendants did not unjustifiably delay Plaintiff's access to his prosthetic leg.

Defendants argue that Plaintiff identifies no evidence, though, that anyone decided to exclude him from the yard, gym or weight room because he is an amputee. There is no such evidence to be found in the record of this case.  Instead, Plaintiff only points to evidence that he was excluded from the yard, gym, and weight room because he was using crutches at the time.  Defendants contend that crutches were barred from the yard, gym, and weight room because of security, safety, and medical concerns that arise from

---

[51] For example, when Plaintiff objected to his housing assignment in J-Pod because he did not want to go up the steps to that second floor unit on his crutches  MCCF staff moved Plaintiff to H-2, a general population housing unit on the first level and gave him "bottom bunk status."  Plaintiff testified that he was moved to the general population's H-3 housing section because that section had grab bars in the showers. Additionally, when he was moved to a unit too close to the shower area, his request to move away from the slippery floors was granted.

the use of crutches in those locations in a prison setting.  Those legitimate concerns exist whether the person using the crutches is disabled or not.

Public entities are to be shown deference when evaluating whether, due to security concerns, their actions were reasonable.  Here I find that there were legitimate security concerns about having crutches in the yard due to the low-hanging razor wire and the fact that the crutches could be used as a weapon.  There is not an "absence of substantial evidence in the record" to indicate that the prison has exaggerated its response to these considerations.  Turner v. Safley, 482 U.S. 78, 86 (1987) (quoting Pell v. Procunier, 417 U.S. 817, 827 (1974)).  Additionally, Defendant offered Plaintiff the opportunity to be housed in the medical unit.

The record also indicates that Plaintiff's access to the gym and weight room was a medical concern.[52]  Plaintiff made dozens of documented requests and appeals regarding his access to the gym, yard, and weight room, but was not given unrestricted access to the workout facilities until he obtained his prosthetic leg.  This is not to say that Plaintiff's grievances fell on deaf ears.  Almost all of his complaints were timely addressed, such as his complaints about cell accommodations and medical requests.  Additionally, Plaintiff failed to make grievances in many instances, such as requests for his prosthesis, complaints about how the prison guards were treating him, and requests for a shower seat.  Finally, Defendants created a reasonable accommodation by allowing Plaintiff access to the medical housing unit, which he refused.  They permitted him time in the

---

[52] CMC could restrict inmates with crutches or canes from the gym and the weight room because of the safety of the inmate with the crutches, as well as for the safety of other inmates in the gym or weight room who could also be harmed in an accident or collision with the inmate on crutches.  Deposition of Nikki Holler

yard alone.  Therefore, I will grant Count Defendants' Motion for Summary Judgment as to the ADA and RA claims.

**IV.     Conclusion**

For the foregoing reasons, I will deny Plaintiff's Partial Motion for Summary Judgment, and I will grant the Defendants' Partial Motion for Summary Judgment.

An appropriate Order follows.